UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION

YVONNE LLOYD                                                                                    PLAINTIFF

v.                                       CASE NO. 4:06-CV-01546 GTE

DEL-JEN, INC./FLUOR COMPANY, LRJCC                                              DEFENDANT

ORDER

Presently before the Court is Defendant's Motion for Summary Judgment.

I. Background

Del-Jen, Inc. operates a Job Corps Center in Little Rock, Arkansas. Del-Jen hired Plaintiff on March 23, 2000, as a Driver at the Little Rock Job Corps Center ("LRJCC"). Plaintiff's primary responsibility as a Driver was to provide general transportation to LRJCC students. Del-Jen's "No Harassment Policy" explicitly prohibits harassment on the basis of sex, as well as other protected classifications.

As a federal contractor, Del-Jen must comply with the Federal Drug-Free Workplace ("DFWA") Act of 1988, which provides, in part, that employees in positions covered by the United States Department of Transportation ("DOT") regulations are subject to random drug tests. Plaintiff's driver position, which required Plaintiff to possess a Commercial Driver's License, was a DOT-regulated position, and therefore, Plaintiff was subject to random drug testing. Del-Jen's Employee Handbook also includes a "Drug/Alcohol Use" policy, which provides that as a condition of employment, each employee "is required to cooperate with Del-Jen's efforts to provide a drug and alcohol-free workplace."

1

Plaintiff received certification and training on Del-Jen's Drug & Alcohol-Free Workplace Procedure ("Del-Jen's Procedure") at various intervals throughout her employment. Del-Jen's Procedure prohibits "[t]esting positive for . . . illegal drugs on a test that has been requested in accordance with this policy." Del-Jen's Procedure also provides that Del-Jen will inform the employee in writing of the positive test result, the consequences of the test result, and the employee's available options within 5 working days after receipt of a positive confirmed test result from the Medical Review Officer (MRO). "[Del-Jen] will provide a copy of the test results to the employee . . . if he or she requests a copy." "[Del-Jen] will not discharge, discipline, refuse to hire, discriminate against, or request or require rehabilitation of an employee . . . on the basis of a positive test result that has not been verified by a confirmation test and by a MRO." Plaintiff, as a DOT covered employee, had the right to contest a positive test result within 72 hours. This 72 hour time limit is not discretionary, as it is established by DOT regulations. Plaintiff had the right to have the sample re-tested at her expense, and if the second result negated the first result, Del-Jen would pay for the second test.

On March 29, 2006, Plaintiff submitted a urine specimen for a random drug test to Concentra Medical Centers in North Little Rock, Arkansas. Concentra sent Plaintiff's urine specimen to Advanced Toxicology Network for initial testing. The initial test was reported as positive for Cannabinoid (marijuana). Plaintiff asserts that the initial test was a false positive because she never used a drug with Cannabinoid in it. The specimen was then sent to Medical Review Officer, Dr. H.D. Belk with National Diagnostics, Inc. in Charlotte, North Carolina for confirmation testing. On April 6, 2006, Dr. Belk confirmed that Plaintiff's specimen was positive for Cannabinoid, and informed Plaintiff by telephone of the positive test result and that

he had to report the results to Del-Jen. Dr. Belk also explained to Plaintiff that the sample is divided into half and that she could challenge the findings by having the other half tested at her own expense. On April 6, 2006, Plaintiff told her immediate supervisor, Darnell McClinton, that she received notice that she had tested positive for illegal drugs. Mr. McClinton told Plaintiff to report the results to former Human Resources Manager, Henry Akins.

A memorandum dated April 13, 2006, prepared by Mr. Atkins states:

Ms. Lloyd made a visit to my office on Thursday 6, 2006 explaining her concerns about testing positive on her random CDL drug screening. She explained how a lady called her house and spoke to her mother on the 5th of April explaining that Ms. Lloyd needed to call the doctor of the testing facility for her results on 4/6/06. On 4/6/06 Ms. Lloyd did that on her break while at work. She said the doctor explained that the test she took on 3/29/2006 had tested positive for marijuana.
 . . .
She also asked could she be retested, and his response was, at her own expense and it would be very expense. Ms. Lloyd tried to get this accomplished.

I called Sergio after this for advice on 4/6/2006, he referred me to Mark Gapetz who I tried to contact but he was tied up on emergency business, but did manage to give me a short email on the procedures of drug testing. Mark stated in the email that we should get test results within a day or two, this didn't happen. The employee was informed before employer.

Ms. Lloyd informed me on 4/10/2006 that she was looking for a test facility and I instructed her to make sure it was the same type of facility and that it could only test the same sample she gave at that time according to our policy. She said she would do this.

On 4/12/2006 Ms. Lloyd informed me that she tried to contact the testing facility to pay for the sample to be shipped; they informed her it was too late. A retest has to occur within 72 hours of the initial testing and after 72 hours the sample is destroyed.

I was referred to Mr. Bob Clemans CDL contractor for Del-Jen, Inc. by Ann Gapetz on 4/13/2006. He informed me of the 72 hour window and said that He should have been notified as well. He also said that Mr. White and McClinton have been trained on the 72 hour policy as well and given material on the subject.

>Mr. McClinton provided me with the information the Mr. Clemans left with him. It failed to mention the 72 hour DOT policy.
>
>I spoke with the MRO Dr. Belk and he informed me that he may no have explained all of the DOT policies to Ms. Lloyd, but he replied that he did explain the 72 hour DOT policy to her.
>
>The Mr. McClinton, Safety Manager, his employee Ms. Lloyd and I were not made aware of this policy nor is it in our employee hand book for employees to reference.  It is a DOT policy that is not incorporated into our policy.
>
>After talking to Ms. Beverly Lovett she agree as well as I, to retest Ms. Lloyd today 4/14/06.  Ms Lovett stated that if her test is negative this time we should retest Ms. Lloyd more often according to DOT regulations.

Defendant submits an affidavit from Sergio Bautista, Senior Director of Human Resources, which discusses the events leading up to Plaintiff's termination:

>15. Mr. Atkins, however, mistakenly allowed Ms. Lloyd to submit an entirely new urine sample for testing on April 14, 2006.  That urine sample was negative for illegal drugs.
>
>16. Del-Jen's past practice has been to terminate employees who test positive for illegal drugs.  Indeed, we have terminated the employment of other employees, both male and female, at the Little Rock Job Corps Center, because of positive drug tests.
>
>17. I spoke with Beverly Lovett, Director of Job Corps Operations for Del-Jen, Inc. and Mr. Gapetz to discuss what action to take in response to Ms. Lloyd's positive drug test.  Consistent with Del-Jen's policy and Del-Jen's past practices, Ms. Lovett, Mr. Gapetz, and I decided to terminate Ms. Lloyd's employment on April 26, 2006.
>
>18. In June 2006, I learned from Ms. Lovett that Ms. Lloyd's employment had not been terminated as we decided.  I also learned that Mr. Atkins had allowed Ms. Lloyd to resume driving duties following receipt of the negative results from Ms. Lloyd's second test.
>
>19. Ms. Lovett and I agreed that we needed to meet in Little Rock, Arkansas at the Job Corps site to investigate why Mr. Atkins had not terminated Ms. Lloyd's employment.  However, because of conflicts between my travel

      schedule and Ms. Lovett's travel schedule, we were not able to meet in Little Rock until July 5, 2006.

20. During my visit to Little Rock, Ms. Lovett and I met with Mr. Atkins and asked him why Ms. Lloyd had not been fired. Ms. Atkins explained that he was reluctant to terminate Ms. Lloyd's employment because she tested negative for drugs on April 14, 2006. Mr. Atkins also indicated that he thought Ms. Lloyd's failure to timely request a retest of her original sample should be excused because Ms. Lloyd mistakenly believed that her original control sample had been destroyed.

21. Before making a final determination concerning Ms. Lloyd's employment, I confirmed that Del-Jen has consistently terminated the employment of employees who test positive for illegal drugs. I also reviewed Plaintiff's performance history and discovered that Plaintiff had been involved in multiple traffic accidents while operating Del-Jen vehicles. I also confirmed the earlier position that Ms. Lovett, Mr. Gapetz and I reached–that Ms. Lloyd's second test of an entirely new sample did nothing to negate the positive test from her first urine sample. Based on this further evaluation, I concluded that there were no circumstances sufficient to reverse our earlier decision to terminate Ms. Lloyd's employment because she failed the random drug test. Ms. Lovett agreed with my conclusion. Ms. Lovett and I collectively decided that the initial termination decision should stand and that Ms. Lloyd's employment should be terminated immediately.

22. On July 17, 2006, I sent an e-mail to DeMoyn McCoy, the newly-hired Center Director at the Little Rock Job Corps Center, instructing him to terminate Plaintiff's employment because of her positive drug test.

23. Ms. Lovett and I made the decision to terminate Ms. Lloyd's employment based on her failed drug test, and for no other reason.

24. I did not learn that Ms. Lloyd had filed a discrimination complaint with the EEOC until sometime after I made the decision to terminate her employment because of her failed drug test.

Additionally, Defendant submits the affidavit of Beverly Lovett, Director of Staff Development and Training for Del-Jen, which states:

5

9. Henry Atkins, who was the LRJCC Human Resources Manager at the time, and I mistakenly permitted Ms. Lloyd to submit a new urine sample for testing on April 14, 2006. This sample tested negative for marijuana.

10. On April 26, 2006, Sergio Bautista, Mark Gapetz, and I agreed to terminate Ms. Lloyd's employment because of her failed drug test. This is consistent with our past practices–we have consistently terminated the employment of employees who test positive for illegal drugs. I instructed Mr. Atkins to terminate Ms. Lloyd's employment for failing a drug test.

11. Shortly after I instructed him to terminate Ms. Lloyd's employment, Mr. Akins took a leave of absence and was away from work for several days in May 2006. I was also traveling for some additional corporate oversight duties in May and June 2006 and not consistently present at the Little Rock location. As a result, I did not confirm whether Mr. Akins had followed my instruction to terminate Plaintiff's employment.

12. On June 9, 2006, I received a telephone call and email from Bob Clemans, Del-Jen's Transportation Fleet Manager, which addressed Ms. Lloyd's failed drug test and her driving privileges as a result of this drug test. Mr. Clemans indicated to me that he thought we had terminated Ms. Lloyd's employment because of her failed drug test. I talked to Darnell McClinton and instructed him to place Ms. Lloyd back in a non-driving position and to keep her in that position until Sergio Bautista could speak or meet with me to investigate why Ms. Lloyd was still employed at Del-Jen.

13. Mr. Bautista and I had conflicting travel commitments for much of June 2006, and therefore, were not able to meet in Little Rock until July 5, 2006. Once there, we met with Mr. Akins to find out why he did not terminate Ms. Lloyd's employment. Mr. Akins indicated that he was reluctant to terminate Ms. Lloyd's employment because Ms. Lloyd tested negative for drugs on April 14, 2006 and because Ms. Lloyd mistakenly believed that her original sample had been destroyed and could not be retested.

14. To address Mr. Akins concerns, I contacted the Medical Review Officer's office and confirmed (1) that the test results of Ms. Lloyd's initial urine specimen were verified positive by Dr. Belk; (2) that Dr. Belk contacted Ms. Lloyd on April 6, 2006 informed her of the results; and (3) that Dr. Belk advised Ms. Lloyd of her right to request a retest of her original urine specimen, at her own expense, within 72 hours. Additionally, I confirmed that Ms. Lloyd's specimen had not been destroyed because the lab keeps the specimen for one year. I explained these facts to Mr. Bautista.

15. Over the next week or so, Mr. Bautista and I reviewed Ms. Lloyd's personnel records and confirmed that Del-Jen has consistently terminated the employment of other employees who test positive for illegal drugs. I recommended to Mr. Bautista that he not reverse the earlier decision to terminate Ms. Lloyd's employment because her positive drug test. He agreed.

16. On July 17, 2006, Mr. Bautista copied me on an e-mail he sent to DeMoyn McCoy, the newly-hired Center Director at LRJCC, instructing him to terminate Ms. Lloyd's employment because of her positive drug test.

17. Ms. Lloyd left work early on July 18, 2006 and did not return to work until July 21, 2006. Ms. Lloyd indicated that she was absent from work for medical reasons. When Ms. Lloyd returned to work on July 21, 2006, Mr. McClinton communicated the termination decision to her.

18. I did not learn that Ms. Lloyd had purportedly filed a charge of discrimination with the EEOC until after Mr. Bautista and I agreed to stand by the earlier decision to terminate her employment because of her failed drug test. Del-Jen terminated Ms. Lloyd's employment for testing positive for illegal drugs and for no other reason.

At the point that Del-Jen learned of Plaintiff's positive test, it removed her from her driving duties and temporarily assigned her to a non-driving position in the security shack pending a determination of her employment status. On or about April 12, 2005, Plaintiff requested a retest through Dr. Belk's office, but was informed that she had waited too long. On or about April 16, 2006, Plaintiff submitted a new sample for testing, which was verified as negative for illegal drugs that same day. After receiving the results from Plaintiff's second test, Mr. Atkins and Mr. McClinton allowed Plaintiff to resume driving duties.

On July 20, 2006, Plaintiff filed charges of discrimination against Defendant with the Equal Employment Opportunity Commission ("EEOC"), alleging a hostile work environment and gender based discrimination from April 3, 2006 until July 20, 2006. Specifically, she stated:

> I was hired on March 23, 2000 as a transport driver. On or about April 3, 2006, I began to notice a difference in how my supervisor treated male and female employees. I and other female employees were yelled at and told by the supervisor that he would not hire more females and that he did not like strong women.
>
> I was told by the senior security officer that she was instructed to write-up a number of females for frivolous incidents and she refused.
>
> I believe [I] was intimidated because of my sex, female, in violation of VII of the Civil Rights Act of 1964, as amended.

She further stated:

> The month of April of 06, LRJCC, Security Guard office, Mr. D. McClinton made a statement looking direct at me, s/o Security Guard Betty Butler was in the security office also, Mr. D. McClinton said if it was left up to him he wouldn't hire any women.
> . . .
> Mr. McClinton wants to hire male employee instead of female employee.

Although Plaintiff testified that she and a person at the EEOC faxed a copy of the Charge of Discrimination to Del-Jen on July 20, 2006, she has no evidence that Del-Jen ever received this facsimile, and does not know whether the person at the EEOC actually faxed Del-Jen a copy of the Charge of Discrimination. As noted above, Plaintiff was terminated on July 21, 2006. On July 27, 2006, the EEOC issued a "Dismissal and Notice of Rights" letter to Plaintiff.

Plaintiff filed her original Complaint in this action on October 18, 2006. On October 24, 2006, Plaintiff filed a second Charge of Discrimination, which stated:

> I was hired on March 23, 2000 in Transportation. In March 2006, I took a random drug test. Around April 5, 2006, I was contacted and given instructions to contact a doctor. I informed my Supervisor about the positive test results. However, the results were not true. He referred me to Human Resources. Around July 19, 2006, I filed EEOC charge number 493-2006-02161. After I filed the EEOC charge, I faxed it to Human Resources. On July 21, 2006, I was discharged. I was told that I was discharged because of the drug test results which were taken in March 2006.

> I believe that I was discriminated against because of my sex, female and in retaliation for filing a previous EEOC charge, in violation of Title VII of the Civil Rights Act of 1964, as amended.

On February 27, 2007, Plaintiff received a second "Dismissal and Notice of Rights." Plaintiff filed her Amended Complaint on June 6, 2007, which alleges that Plaintiff was treated in a discriminatory manner because of her gender, was subjected to a hostile work environment, and was terminated in retaliation for filing a claim with the EEOC.

## II.   Summary Judgment Standard

Summary judgment is appropriate only when, in reviewing the evidence in the light most favorable to the non-moving party, there is no genuine issue as to any material fact, so that the dispute may be decided solely on legal grounds. *Holloway v. Lockhart*, 813 F.2d 874 (8th Cir. 1987); Fed. R. Civ. P. 56. The Supreme Court has established guidelines to assist trial courts in determining whether this standard has been met:

> The inquiry performed is the threshold inquiry of determining whether there is a need for trial-- whether, in other words, there are genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

The Eighth Circuit set out the burdens of the parties in connection with a summary judgment motion in *Counts v. M.K. Ferguson Co.*, 862 F.2d 1338 (8th Cir. 1988):

> [T]he burden on the party moving for summary judgment is only to demonstrate, i.e., '[to] point[] out to the District Court,' that the record does not disclose a genuine dispute on a material fact. It is enough for the movant to bring up the fact that the record does not contain such an issue and to identify that part of the record which bears out his assertion. Once this is done, his burden is discharged, and, if the record in fact bears out the claim that no genuine dispute exists on any material fact, it is then the respondent's burden to set forth affirmative evidence,

> specific facts, showing that there is a genuine dispute on that issue. If the respondent fails to carry that burden, summary judgment should be granted.

*Id*. at 1339 (quoting *City of Mt. Pleasant v. Associated Elec. Coop.*, 838 F.2d 268, 273-74 (8th Cir. 1988)) (citations omitted)(brackets in original).

"A party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] . . . which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). However, the moving party is not required to support its motion with affidavits or other similar materials negating the opponent's claim. *Id*.

Once the moving party demonstrates that the record does not disclose a genuine dispute on a material fact, the non-moving party may not rest upon the mere allegations or denials of his pleadings, but his response, by affidavits or as otherwise provided in Rule 56, must set forth specific facts showing that there is a genuine issue for trial. Fed. R. Civ. P. Rule 56(e). The plain language of Rule 56(c) mandates the entry of summary judgment against a non-moving party which, after adequate time for discovery, fails to make a showing sufficient to establish the existence of an element essential to its case, and on which that party will bear the burden of proof at trial. *Celotex Corp.*, 477 U.S. at 322.

### III.  Motion for Summary Judgment

In reviewing Plaintiff's discrimination claim, we bear in mind that summary judgment is disfavored in employment discrimination cases, as such cases are "inherently fact-based." *Simpson v. Des Moines Water Works*, 425 F.3d 538, 542 (8th Cir. 2005). Nonetheless,

"summary judgment is proper when a plaintiff fails to establish a factual dispute on an essential element of her case." *Id.*

> A plaintiff may survive the defendant's motion for summary judgment in one of two ways. The first is by proof of "direct evidence" of discrimination. Direct evidence in this context is not the converse of circumstantial evidence, as many seem to assume. Rather, direct evidence is evidence "showing a specific link between the alleged discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated" the adverse employment action. Thus, "direct" refers to the causal strength of the proof, not whether it is "circumstantial" evidence. A plaintiff with strong (direct) evidence that illegal discrimination motivated the employer's adverse action does not need the three-part *McDonnell Douglas* analysis to get to the jury, regardless of whether his strong evidence is circumstantial. But if the plaintiff lacks evidence that clearly points to the presence of an illegal motive, he must avoid summary judgment by creating the requisite inference of unlawful discrimination through the *McDonnell Douglas* analysis, including sufficient evidence of pretext.

*Griffith v. City of Des Moines*, 387 F.3d 733, 736 (8th Cir. 2004) (internal citations omitted) Because Plaintiff has not submitted "direct evidence" of discrimination, she must produce sufficient circumstantial evidence of illegal discrimination under the *McDonnell Douglas*[1] paradigm. *See Griffith*, 387 F.3d at 736-37.

In an employment discrimination case, the plaintiff must initially present a prima facie case to survive a motion for summary judgment, which raises a rebuttable presumption of discrimination. *Kiel v. Select Artificials, Inc.*, 169 F.3d 1131, 1134-35 (8th Cir. 1999). The employer must then rebut the presumption of discrimination by articulating a legitimate, non-

---

[1] The Eighth Circuit has ruled that while *Desert Palace, Inc. v. Costa,* 539 U.S. 90, 123 S. Ct. 2148, 156 L. Ed.2d 84 (2003), is relevant in the context of mixed-motive jury instructions, "*Desert Palace* had no impact on prior Eighth Circuit summary judgment decisions," and therefore, the *McDonnell Douglas* framework remains the proper mode of analysis for summary judgment cases. *See Simpson*, 425 F.3d at 542 n.4.

discriminatory reason for the adverse employment action. *Id.* at 1135.  If the employer does this, the burden of production shifts back to the plaintiff to demonstrate that the employer's non-discriminatory reason is pretextual.  *Id.*

### A.	Disparate Treatment

Plaintiff asserts a claim for sex discrimination based on a theory of disparate treatment. "To establish a disparate treatment claim, a plaintiff must show that: (1) he or she is a member of a protected class; (2) he or she was meeting the legitimate expectations as to his her duties; (3) he or she suffered an adverse employment action; and (4) 'circumstances give rise to an inference of discrimination as similarly situated employees, who were not members of the protected group, were treated differently.'" *Gilooly v. Missouri Dept. of Health and Senior Servs.*, 421 F.3d 734, 738-39 (8th Cir. 2005).

First, the Court notes that in Plaintiff's Responses to Defendant's Statement of Uncontroverted Facts, Plaintiff denies many asserted facts "due to lack of sufficient information to form a belief," and state that the affidavits submitted by Defendant are "self-serving testimony" that should be subject to cross-examination at trial and should not be characterized as "uncontroverted."  Plaintiff cannot rely on such blanket denials.  The discovery process afforded Plaintiff the opportunity to obtain sufficient information to form a belief.  Plaintiff's unsupported denials do not meet the requirements under Federal Rule of Civil Procedure 56.

The Court seriously questions whether Plaintiff has sufficiently satisfied the second and fourth elements of her prima facie case, as Plaintiff has presented no evidence that she remained eligible for her job under DOT regulations after failing her drug screen, Plaintiff has presented no evidence that she complied with the 72 hour rule pursuant to DOT regulations, and Plaintiff can

point to no instance in which a male employee who tested positive for drugs was not terminated. However, the Court will assume, without deciding, that Plaintiff has established a prima facie case. Regardless, under the *McDonnell Douglas* standard, Defendant has articulated a legitimate, non-discriminatory reason for terminating Plaintiff's employment, and Plaintiff has failed to prove that the reason was pretextual. Defendant asserts that Plaintiff's employment was terminated due to her failed drug test. Plaintiff claims that Defendant's motives are in question due to Defendant's failure to inform Plaintiff in writing of the test results, her available options, or provide Plaintiff a copy of the test results. Additionally, Plaintiff states that Defendant did not verify the test result by a confirmation test. However, it is undisputed that the initial test by Advanced Toxicology Network was reported as positive, and a confirmation test performed by Dr. Belk was positive.

"[T]he employment discrimination laws have not vested in the federal courts the authority to sit as super-personnel departments reviewing the wisdom or fairness of the business judgments made by employers, except to the extent that those judgments involve intentional discrimination. Title VII prohibits intentional discrimination based on certain, discreet classifications; it does not prohibit employment decisions based on other factors, such as job performance, erroneous evaluations, personality conflicts, or even unsound business practices." *Rose-Maston v. NME Hospitals, Inc.*, 133 F.3d 1104, 1109 (8th Cir. 1998) (internal citations omitted). "[E]mployers are free to make their own business decisions, even inefficient ones, so long as they do not discriminate unlawfully." *See Lewis v. St. Cloud State University*, 467 F.3d 1133 (8th Cir. 2006); *Hanebrick v. Brown Shoe Co.*, 110 F.3d 644, 646 (8th Cir. 1997). Summary judgment is appropriate on Plaintiff's disparate treatment claim.

### B.     Retaliation

Title VII prohibits retaliation against an employee who files charges of discrimination. 42 U.S.C. § 2000e-3(a); *Thompson v. Bi-State Development Agency*, 463 F.3d 821, 826 (8th Cir. 2006). As with Plaintiff's disparate treatment claim, absent direct evidence of retaliation, the Court must apply the *McDonnell Douglas* three-part burden-shifting analysis to her retaliation claim. *Thompson*, 463 F.3d at 826. Under this framework, the Court must first determine whether Plaintiff has presented a prima facie case of retaliation. *Id.*

To establish a prima facie case of retaliation, Plaintiff must present evidence that 1) she engaged in activity protected under Title VII; 2) an adverse employment action was taken against her; and 3) a causal connection between the two. *Id.* "The defense may rebut a plaintiff's claim by advancing a legitimate, 'non-retaliatory reason for the adverse employment action.'" *Gilooly*, 421 F.3d at 739. "If the defendant can show a legitimate reason, the plaintiff must show that the given reason was only a pretext for discrimination." *Id.* It is important to note that although Plaintiff did not succeed in her underlying claims, a plaintiff need not succeed on the underlying claims to establish a retaliation claim. *Id.*

First, Defendant argues that Plaintiff has failed to establish a causal connection between her termination and her initial charges made against the Defendant. The Court agrees. Plaintiff cannot dispute that the decision to terminate her was made on April 26, 2006, and that Mr. Atkins' failure to terminate Plaintiff's employment was subsequently investigated. Furthermore, Plaintiff cannot dispute that Mr. McCoy was instructed to terminate her on July 17, 2006, through an e-mail from Mr. Bautista. Additionally, Plaintiff has no proof that Defendant was

14

aware of her EEOC Charge of Discrimination on July 21, 2006, the day Mr. McClinton terminated Plaintiff's employment.

Even if Plaintiff had established a prima facie case of retaliation, as discussed above, Defendant has set forth a legitimate, non-retaliatory reason for the adverse employment action, and Plaintiff has failed to prove that the reason was pretextual. Defendant asserts that Plaintiff's employment was terminated due to her failed drug test. Plaintiff claims that Defendant's motives are in question due to Defendant's failure to inform Plaintiff in writing of the test results, her available options, or provide Plaintiff a copy of the test results. Additionally, Plaintiff states that Defendant did not verify the test result by a confirmation test. However, it is undisputed that the initial test by Advanced Toxicology Network was reported as positive, and a confirmation test performed by Dr. Belk was positive. Summary judgment is appropriate on Plaintiff's retaliation claim.

     **C.**     **Hostile Work Environment**

To establish a hostile work environment claim, Plaintiff must show (1) she is a member of a protected class, (2) she was subjected to unwelcome harassment, (3) the harassment was based on a protected characteristic under Title VII, (4) the harassment affected a term, condition or privilege of employment, and (5) employer liability. *Al-Zubaidy v. TEK Industries, Inc.*, 406 F.3d 1030, 1038 (8th Cir. 2005). "To establish the fourth element, a plaintiff must prove that the harassment was 'so severe or pervasive as to alter a term, condition, or privilege of employment.'" *Gilooly*, 421 F.3d at 738. "The conduct at issue must not be 'merely rude or unpleasant.'" *Id.* "A plaintiff must establish harassment that is 'so intimidating, offensive, or hostile that it poisoned the work environment.' " *Id.*

The Court can determine "whether an environment is 'hostile' or 'abusive' ⋯ only by looking at all the circumstances[, which] may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Al-Zubaidy*, 406 F.3d at 1038. "Offhand comments and isolated incidents of offensive conduct (unless extremely serious) do not constitute a hostile work environment." *Burkett v. Glickman*, 327 F.3d 658, 662 (8th Cir. 2003) (citing *Faragher v. City of Boca Raton,* 524 U.S. 775, 786-88, 118 S. Ct. 2275, 141 L. Ed. 2d 662 (1998)). Such standards are demanding, for "Title VII does not prohibit all verbal or physical harassment" and is not "a general civility code for the American workplace." *Oncale v. Sundowner Offshore Servs., Inc.,* 523 U.S. 75, 80, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998).

Plaintiff submits her deposition testimony in which she alleges that Mr. McClinton "doesn't like strong women," he would scream, holler and yell at her, and he changed his attitude toward her. She also testified that Mr. McClinton stated that if it was left up to him, "he wouldn't hire any womens, it would be all mens." Plaintiff states that Mr. McClinton once yelled about a female employee taking time off from work to file taxes, but Plaintiff did not know whether male employees had also taken time off to file their taxes. Plaintiff further states that Mr. McClinton once yelled at her when she asked him for a raise and forced her to report to work on a day she was scheduled to be on vacation. However, Plaintiff states that Mr. McClinton yelled that he could not "take care of" a raise request because Ms. Lovett handled that, and it appears that Plaintiff's vacation was only "pushed back" because of a mandatory meeting. Plaintiff also alleged that prior to April of 2006, Mr. McClinton made sexual jokes and

used certain words. For instance, "Like if I tell Ms. Lloyd to lose weight, she better, I can't stand a fat woman. . . . Body parts, chest, behind, just talking about a woman's body parts in general as far as how she look, dress, how she dressed, what type of person he liked."[2]

Plaintiff also submits the affidavits of Mr. Henry Akins and Jo Ann Stewart. Mr. Akins states:

> 10. Darnell McClinton was constantly hitting on women in the office and the female students and making inappropriate comment of a sexual nature.
>
> . . .
>
> 12. Darnell McClinton said improper things of a sexual nature and I tried to help him change his persona.
>
> 13. Darnell McClinton promoted males over more deserving females because they were female. The males would always get the better work schedules. Mr. McClinton preferred not to have women on detail.

Ms. Stewart states that Mr. McClinton would often be in her fellow teacher's room, he was obviously interested in her sexually, and she and her fellow teacher agreed that Mr. McClinton's behavior was inappropriate and made both of them uncomfortable.[3]

---

[2]The Court questions whether these allegations should be considered. However, in *National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115-21, 122 S. Ct. 2061, 2073-76 (2002), the Supreme Court explained that "[p]rovided that *an act contributing to the claim* occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability," although the Court recognized that employers have recourse when a plaintiff unreasonably delays filing a charge. (emphasis added). The Supreme Court seems to broaden the scope of facts considered when analyzing a hostile work environment claim, as opposed to claims based on discrete discriminatory or retaliatory acts, because "[h]ostile environment claims are different in kind from discrete acts" and "[t]heir very nature involves repeated conduct." *Id*. at 115, 122 S. Ct. at 2073. Because the consideration of these allegations does not change the Court's final decision, the Court will assume, without deciding, that these allegations are properly before the Court for purposes of Plaintiff's hostile work environment claim.

[3]The Court questions whether these allegations should be considered because it is not clear that Plaintiff was aware of the specific instances of conduct alleged by Ms. Stewart. However, the Court will consider the allegations which do not change the Court's decision.

Eighth Circuit precedent persuades the Court that the alleged conduct did not create an actionable hostile work environment.[4]  This Court has rejected claims of hostile work environment premised on equally or more egregious facts than those set forth by Plaintiff.  The Court finds that Plaintiff failed to demonstrate that the alleged harassment was sufficiently severe or pervasive to alter the conditions of her employment and create a hostile work environment.  Summary judgment is granted as to Plaintiff's hostile work environment claim.

Accordingly,

IT IS THEREFORE ORDERED THAT Defendant's Motion for Summary Judgment (Docket No. 63) be, and it is hereby GRANTED.  Plaintiff's Complaint is dismissed with prejudice.

IT IS FURTHER ORDERED THAT Plaintiff's Motion to Exclude Witnesses (Docket No. 75) be, and it is hereby, DENIED as moot.

---

[4]*See Nitsche v. CEO of Osage Valley Elec. Co-op.*, 446 F.3d 841, 846-47 (8th Cir. 2006); *Cottrill v. MFA, Inc.*, 443 F.3d 629, 638 (8th Cir. 2006) (citing *LeGrand v. Area Res. for Cmty. & Human Servs.,* 394 F.3d 1098, 1100-03 (8th Cir.2005) (finding no objectively hostile work environment created by defendant's unwelcome sexual advances on three separate occasions over a nine-month period, including asking the employee to watch pornographic movies with him, hugging and kissing, and grabbing the employee's buttocks and thigh); *Tuggle,* 348 F.3d at 720 (holding no actionable hostile work environment based on defendant's inappropriate sexual comments, taking a photograph of plaintiff's rear end and giving plaintiff undesirable work assignments); *Duncan v. Gen. Motors Corp.,* 300 F.3d 928, 933 (8th Cir.2002) (holding no actionable hostile work environment where co-employee asked plaintiff if she would have a relationship with him, touched the plaintiff's hand on four to five occasions, requested the plaintiff sketch a sexually objectionable planter, asked plaintiff to complete a task on his computer where its screen saver depicted a naked woman, hung an offensive poster, and asked plaintiff to type a document for him containing sexually offensive items)); *Henthorn v. Capitol Communications, Inc.*, 359 F.3d 1021, 1027 (8th Cir. 2004) (citing *Alagna v. Smithville R-II Sch. Dist.,* 324 F.3d 975, 980 (8th Cir. 2003) (finding to be inappropriate but not actionable conduct that involved frequent calls to plaintiff's home, regular visits to her office, the bestowing of gifts, the touching of plaintiff's arm, and the frequent expressions of "I love you").

IT IS FURTHER ORDERED THAT Defendant's Motion to Quash Subpoena Duces Tecum (Docket No. 83) be, and it is hereby, DENIED as moot.

IT IS FURTHER ORDERED THAT Plaintiff's Motion for Sanctions for Discovery Abuses (Docket No. 87) be, and it is hereby, DENIED as moot.

IT IS SO ORDERED this 3rd day of October, 2007.

/s/Garnett Thomas Eisele
UNITED STATES DISTRICT JUDGE